[Civ. No. 3053.   Third Appellate District.—February 27, 1926.]

## P. A. PALMER et al., Respondents, v. COUNTY OF SHASTA, Appellant.

[1] COUNTIES—CONTRACTS—CONFLICTING EVIDENCE—FINDINGS—APPEAL. Where, as in this action against a county to recover a balance alleged to be due upon a contract for the construction of an approach to a bridge, the findings in favor of the plaintiff upon every material point are based upon conflicting testimony, and there is testimony in the record of a substantial nature which, if believed by the trial court, is sufficient to sustain every finding challenged on appeal, the appellate court will not disturb the judgment of the trial court, even though the appellate court might be of the opinion that the testimony would have supported a contrary finding or judgment, or even though the weight of the testimony appears to be against the finding of the trial court.

[2] ID.—CONSTRUCTION OF BRIDGE—PLANS AND SPECIFICATIONS—CONFLICTING TESTIMONY—APPEAL.—In this action against a county to recover a balance alleged to be due upon a contract for the construction of a fourteen-span approach to a bridge, the question of whether the plans and specifications provide for construction joints over the alternative or odd-numbered piers was a controverted question before the trial court, and was decided by that court upon conflicting testimony, and such finding was conclusive upon the appellate court.

[3] ID.—BALANCE DUE ON CONTRACT—INTEREST.—In an action against a county to recover a balance alleged to be due upon a contract for the construction of an approach to a bridge, it is error to allow interest from a date prior to the entry of judgment.

(1) 4 C. J., p. 884, n. 37, p. 886, n. 47.   (2) 4 C. J., p. 884, n. 37. (3) 15 C. J., p. 251, n. 69, p. 662, n. 29.

APPEAL from a judgment of the Superior Court of Tehama County. John J. Ellison, Judge. Modified and affirmed.

The facts are stated in the opinion of the court.

Jesse W. Carter, District Attorney, for Appellant.

Knight, Boland, Hutchinson & Christin for Respondents.

1.   See 2 Cal. Jur. 921; 2 R. C. L. 204.

PLUMMER, J.—Action by plaintiffs to recover balance alleged to be due upon a contract for the construction of an approach to Anderson Free Bridge in the County of Shasta, state of California. The plaintiffs had judgment in the sum of $10,568.04. From this judgment the defendant appeals.

On or about the tenth day of September, 1920, the plaintiffs and defendant entered into a contract for the construction of an approach to the Anderson Free Bridge in Shasta County. The approach was to consist of a re-enforced concrete bridge 560 feet in length, of 14 spans. The contract price for the bridge was the sum of $39,000. At a later date a supplemental contract was entered into, which changed the dates of payment provided for in the original contract, but otherwise leaving the original contract in full force and effect. The plans and specifications were prepared by C. R. Weigel, county surveyor of Shasta County, and the bridge was constructed under the personal inspection of Mr. Wiegel and his deputy. According to the defendant's interpretation, the bridge was designed as a simple span bridge, of spans 40 feet in length resting upon piers, with expansion joints on the even-numbered piers and construction or stop joints on the odd-numbered piers. There is no controversy as to the expansion joints being provided for in the plans and specifications, or as to the piers where the expansion joints were to be placed and were placed. There is controversy as to whether construction joints were provided for in the plans and specifications. After the work had been finished according to plans and specifications, as interpreted by the plaintiffs, there appeared certain defects in the bridge, to remedy which the defendant expended the sum of some $12,955. The defendant also filed a counterclaim in which it alleged the expenditure of this sum of money to complete the bridge according to the plans and specifications; that the plaintiffs had not finished the bridge according to contract and plans and specifications; that there was due the plaintiffs for the work performed by them the sum of $10,464.94, and that by reason of the expenditures made by the defendant, as just alleged, there was a balance due to the county of the sum of $2,490.53. The amount claimed by the plaintiffs was the sum of $18,406.22. Upon trial the court gave judgment for the plaintiffs in the sum first herein mentioned.

It is alleged by the defendant that construction joints were omitted from the fixed piers; that expansion joints were not properly constructed; that the cement used in the construction of the bridge was deficient in quantity and that different materials from those provided in the specifications were substituted by the contractors. As to the substitution of materials, it may be here stated that the court found that the specifications called for half-inch spacing bars and the bars actually used were only three-eighths inch in size; that the difference in value was the sum of $150, or thereabouts, credit for which was given to the county and that the substitution in the size of the bars did not in anywise affect the strength of the bridge.

It appears from the record that there are two types of construction used in the erection of concrete bridges such as the approach to the Anderson Free Bridge. One is called the continuous span and the other is a simple span. A simple span bridge in this instance would be the construction of each span independently, that is, 40 feet at a time, with a construction joint over every alternate pier with an expansion joint between the alternate piers. The construction joint consists simply of placing an abutment at the end of alternate spans and pouring the concrete up to the abutment, letting it set, then removing the abutment and proceed with the pouring of the cement of the next following span. A continuous span bridge is one in which expansion joints are placed over the piers or abutments at the end of alternate spans and over the solid or fixed piers the re-enforcing steel is continuous, including reverse bending moment steel. This steel holds the deck of the bridge rigid and prevents it from cracking. In the simple span the reverse bending moment steel and the re-enforcing steel both end at the expansion joint and also at the opposite end of the span at the so-called fixed pier. It would appear from the testimony that cracks are inevitable in concrete bridge construction and therefore it is necessary to have the cracks occur on the line across the bridge that will not affect its supporting strength. If the crack occurs at the end of the girder which is near the center of the pier, the supporting strength of the girder is not affected, but if it occurs at the point where the girder reaches the pier, the crack becomes very material. It is also necessary to have expan-

sion joints sufficiently near together to permit the come and go of the bridge as it may be affected by climatic conditions. Controverting the claims of the defendant, the plaintiffs set forth that construction joints were not provided for in the plans and specifications to be placed over alternate piers, that in fact no construction joints were provided for, that the plans and specifications were defective in their reference to expansion joints and called for the use of material not calculated to function properly, that the defects in the bridge were due to the defects in the plans and specifications and not in the work performed by the plaintiffs.

The trial court found that the plaintiffs had substantially complied with their contract, had built the bridge according to the plans and specifications, that expansion joints were constructed according to the plans and specifications, that construction joints were not ordered placed over any of the piers. The court also found that the plaintiffs had done extra work in the sum of $3,149.13 and that the defendant was entitled to credit for materials furnished and for work done in stripping forms and back-filling, etc., in the total sum of $2,339.09, leaving due the plaintiffs the sum for which judgment was entered herein. The court also gave judgment to the plaintiffs for interest on the amount of the judgment from the third day of November, 1921, the date on which the plaintiffs alleged completion of their contract.

Practically no questions of law are involved in this case. The appeal is brought to us upon questions of fact and the allegation that certain findings of the court relating to the points which we have herein stated are not supported by the evidence. It is further argued on the part of the appellant that the findings are in conflict with the uncontradicted evidence and that the finding, in substance, that the plans and specifications did not call for construction joints over the piers is against uncontradicted evidence. [1] We do not quite see how this claim can be made in view of the fact that the findings printed in this case and called to our attention show that upon every material point the finding of the court is based upon conflicting testimony. There is also testimony in the record of a substantial nature which, if believed by the trial court, is sufficient to sustain every finding challenged in this case. We might rest our decision upon the statement that our investigation of the record shows the

above fact, and then state the familiar rule that an appellate
court will not disturb the judgment of the trial court when
the findings of the latter are based upon conflicting testi-
mony, even though the appellate court might be of the
opinion that the testimony would have supported a contrary
finding or judgment, or even though as printed in the record,
the weight of the testimony appears to be against the finding
of the trial court. However, we will set forth enough
of the testimony to show that the findings challenged are
supported. [2] First, as to whether the contract provided
for construction joints: In the cross-complaint filed by the
defendant, as well as in its answer, it is set forth that the
plans and specifications provide for fourteen construction
joints to be placed in the center of the spans on the approach
to said bridge, all of which were omitted. This might seem
to be an error in the matter of pleading were it not for the
fact that on the fifth day of June, 1922, C. R. Wiegel, the
engineer who drew the plans, in his certificate or letter
written to the board of supervisors of the County of Shasta,
rejecting the bridge in question, contained the following:
"The plans and specifications call for fourteen construction
joints to be placed in the center of spans on said bridge, all
of which have been omitted." Upon the witness-stand, Mr.
Wiegel testified as follows: "Q. Is it your opinion that
construction joints were omitted from the center of the
spans on the approach to the bridge? A. They were. Q.
Are they provided for in the plans and specifications?
A. They are. Q. Will you turn to Exhibit Two and show
use where? A. On page four, under the heading, 'Placing
concrete,' Paragraph B. 'Joints in the concrete due to
stopping work are to be avoided as far as possible, except
where indicated on the plans. Such joints when necessary
shall be horizontal in wall and columns, and shall be at the
tops and bottoms of columns, such joints in girders and
slabs shall be vertical and at the center of the span.' Now
the last two lines of Page Four, under the heading 'Expan-
sion Joints.' 'Expansion joints must be provided at all
points indicated on the plans.' Q. Is that all? A. That is
all." All of the witnesses called by the defendant, to whose
testimony our attention has been directed, contradict Mr.
Wiegel as to the correct interpretation of the plans and are
emphatic that the construction joints should not be placed
in the center of the span except in case of absolute necessity,

due to the stoppage of work or other unavoidable cause; that the construction joints should be over piers. It is further claimed by the witness Wiegel that he transferred the point for the construction joint from the center of the span to a point directly over the center of the pier, i. e., over piers in 1, 3, 5, 7, 9, and 11, and that he did this during the course of construction. Upon this question there is a great deal of conflicting testimony, which we do not need to set forth. There is testimony by engineers called on behalf of the defendant, that the plans and specifications called for construction joints over the odd-numbered piers just named. This testimony is not, however, controverted as claimed by the appellant, as a brief summary will sufficiently show. Mr. Huggard, a witness called on behalf of the plaintiffs, testified as follows: "Q. As a foreman with experience such as you have described, would you read in any part of this exhibit two, that a construction joint was provided for in these plans and specifications over the alternate or solid piers? A. No, sir, absolutely not." Professor Derleth, of the engineering department of the University of California, testified as follows: "Q. I will ask you to again look at sheet one of the specifications and plans, which give the general design of the bridge, and tell us whether a construction joint is provided for on that sheet? A. I see no place on this sheet where construction joints are indicated. Q. You notice a provision for expansion joints, do you? A. Piers 2, 4, 6, 8, 10, 12 and 13 show provision for expansion joints for one span adjacent and fixed end for the other span adjacent to those piers. Q. Will you look now at sheet 2 of those plans and tell us what—whether a construction joint is there provided for? A. I see no reference on sheet 2 to construction joints anywhere." Mr. Leonard, an expert witness called by the plaintiffs, testified as follows: "Q. Will you look at the plans and specifications and tell me whether such a construction joint was provided for in the plans and specifications? A. No, I have looked over them and I cannot find that." This testimony is sufficient to show that the question as to whether the plans and specifications did or did not provide for construction joints was a controverted question before the trial court, and was decided by that court upon conflicting testimony, and hence we must accept such findings as conclusive.

The second objection urged by appellant is based upon the allegation that the expansion joints were not properly constructed and therefore failed to function. Here we have another controverted question. A number of witnesses testified that the expansion joints were built according to the plans and specifications but that the plans and specifications for the joints were so deficient that the expansion joints could not be reasonably expected to function properly. The sliding plates for the construction joints consisted of galvanized iron plates 10 inches wide and 18 feet in length laid across the axis of the bridge. Upon these plates the bridge girders rested. The diaphragm wall also extended down to the top of the pier making the friction surface coincident for the entire 18-foot width of the bridge. It also appears from the testimony that the specifications were conflicting as to the gauge of the galvanized iron plates in one place calling for 14 gauge, 12 inches by 20 feet long. In another place 20 gauge galvanized plates 20 inches by 18 feet in length were specified. According to some of the witnesses, the plates were so thin that they would reflect all the unevenness, if any, of the cement and would also crumple up somewhat like a sheet of wrapping-paper. It also appears that the county engineer was upon the ground, either in person or by deputy, and inspected the construction of the expansion joints during the period of their erection, and, so far as we have been able to discover, did not question that the plans and specifications were being followed at the time the expansion joints were being constructed. The testimony of Mr. Leonard, Professor Derleth, Mr. Huggard, and others was all to the effect that the type of expansion joints provided for in the specifications was such that their proper functioning was exceedingly doubtful. These witnesses testified that the galvanized iron plate was too thin; that it should not have extended for the entire 18 feet; that it should have been under the girders only; that expansion joints, such as were called for in this instance, would freeze, that is, the friction of the galvanized iron plate would be of such a degree as to prevent the sliding movement of the girders. The testimony also shows that when the diaphragm wall was removed, the girders began to work, that is, they would come and go with the expansion of the bridge. Considerable testimony was introduced to the effect that phosfor bronze plates should have been used, also roller bearings

were better calculated to secure efficiency in expansion joints. Testimony was also introduced to the effect that several other bridges having expansion joints, constructed according to the plans and specifications of the bridge in question, had failed to function properly, and that the use of galvanized iron plates was being discarded.

The final ground for reversal really urged by appellant is that the quantity of cement used in the construction of the bridge was deficient. Here again we have the same conflict of testimony. A certain number of witnesses by mathematical calculations, and otherwise, testified that the quantity of cement used was deficient to the number of about 1,000 sacks. On the other hand, a number of witnesses testified that the quantity of cement so used was that directed by the county engineer and was not deficient in quantity. It would serve no useful purpose to set forth this conflicting testimony and it is sufficient to say that the findings of the court have substantial testimony to support them. The matter of the substitution of steel has been heretofore dealt with.

[3] The objection that the court erred in allowing interest from the third day of November, 1921, is well taken. The law is well settled that interest against a county upon claims such as we are here considering does not begin to run until the date of the entry of judgment. Judgment in this case was entered on the twenty-first day of April, 1924. It thus appears that the court erroneously allowed interest for the period of two years, five months, and eighteen days, which interest would amount to the sum of $1,824.66. This part of the judgment must be stricken out, and it is so ordered, and it is further ordered that the allowance of interest date from the entry of judgment, to wit: April 21, 1924. This error in the allowance of interest, as shown by the figures above stated, is not a mere trifling item, and therefore the appellant will be and is hereby allowed its costs on appeal. In all other respects the judgment should be affirmed, and it is so ordered.

Pullen, J., *pro tem.,* and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 26, 1926.